UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOSEPH BIGELOW, #707469,

                Petitioner,

                                        CASE NO. 2:14-CV-11514

v.                                  HONORABLE PAUL D. BORMAN

LLOYD RAPELJE,

                Respondent.

_____/

**OPINION AND ORDER DENYING THE HABEAS PETITION,
DENYING A CERTIFICATE OF APPEALABILITY, AND
DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

**I.    Introduction**

       Michigan prisoner Joseph Bigelow ("Petitioner") has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 asserting that he is being held in violation of his constitutional rights.  Petitioner was convicted of first-degree premeditated murder, Mich. Comp. Laws § 750.316, assault with intent to commit murder, Mich. Comp. Laws § 750.83, and felon in possession of a firearm, Mich. Comp. Laws § 750.227b, following a jury trial in the Wayne County Circuit Court.  He was sentenced to life imprisonment without parole on the murder conviction, a concurrent term of 30 to 50 years imprisonment on the assault conviction, and a consecutive term of two years imprisonment on the felony firearm conviction.

In his pleadings, Petitioner raises claims concerning the conduct of the prosecutor, his appearance in prison clothing at trial, and the admission of other acts evidence.  For the reasons stated herein, the Court finds that his claims lack merit and denies the habeas petition.  The Court also denies a certificate of appealability and denies leave to proceed in forma pauperis on appeal.

## II.    Facts and Procedural History

Petitioner's convictions arise from the fatal shooting of Brittney Burrell and the non-fatal shooting of Jerob Mathis during a drug deal in the Little Easy Bar parking lot in Lincoln Park, Michigan in February, 2011.  At trial, Malessa Robinson testified that she last saw her daughter, Brittney Burrell,  on February 9, 2011 at 9:30 p.m.  Around 2:00 or 3:00 a.m., a police officer came to her house and told her that her daughter had been injured.  At the hospital, she learned that her daughter had been shot in the head.  Her daughter died  on February 13, 2011.  She was 17 years old.

Michael Vago testified that he lived in an upper flat on Olive Street in Lincoln Park, around the corner from the Little Easy Bar, on February 10, 2011.  He met Petitioner five or six months earlier and knew him by the nickname "Joe-Joe."  On February 9, 2011, Petitioner came to his flat at about 7:00 p.m.  He and Petitioner walked to a party store and bought beer.  They returned to his flat and drank.  Petitioner subsequently left, saying that he was going out to get a blunt.  When Petitioner returned about 20 minutes later, he was hyper and asked Vago's girlfriend, Kimberly James, if he had been shot and if she saw blood on him.  Vago admitted that in his police statement, he

2

reported that Petitioner said he shot someone over weed.  Petitioner then pulled out a gun.
Vago identified a photograph of the gun that he saw – it was black and rusty with
electrical tape around the handle.  Vago told Petitioner that he had to leave because Vago
could not have guns in his home.  Petitioner took some spent shells out of the gun, threw
them out of a bedroom window, and left.

On cross-examination, Vago acknowledged that at the preliminary examination, he
testified that when Petitioner returned to his flat and asked if he had been shot, Petitioner
said that he had been involved in a shootout.  Vago also admitted that he gave a police
statement in which he said that Petitioner told him that a man had tried to rob him and
that he and the man shot at each other.  On redirect examination, Vago testified that
Petitioner told him about an incident that had happened a few days earlier.  Petitioner told
him that he had tried to rob a man who was walking on Dix, but the man fought back and
Petitioner fired at him.  Vago admitted that he gave a police statement in which he said
that Petitioner told him that he shot someone over weed.

Kimberly James, Vago's girlfriend, essentially corroborated Vago's testimony
about Petitioner's conduct and comments on the evening of February 9, 2011.

Patrick Grayczyk, the live-in boyfriend of Petitioner's grandmother, Sharon Fiske,
testified that Petitioner stayed with them periodically.  One day in January, 2011, he saw
a revolver on the kitchen table.  There was a dispute over the gun between Petitioner and
Fiske.  Around 1:00 a.m. on February 10, 2011, he was sleeping with Fiske in her
one-bedroom apartment when Petitioner arrived.  They told him that there was food and a

3

bed for him, but he left after a few minutes.  Grayczyk called Petitioner between 1:05 a.m. and 1:15 a.m. and asked him where he was and what he was doing.  Petitioner said that he was fine and had a place to stay.  Grayczyk acknowledged telling the police that when Fiske confronted Petitioner about the gun on the kitchen table, Petitioner said that he did not want someone shooting at him.  Grayczyk testified that a photograph of a gun recovered by police did not resemble the gun that he saw on the kitchen table.

Sharon Fiske, Petitioner's grandmother, testified that she lived a block from the Little Easy Bar.  She corroborated Grayczyk's testimony about the gun on the kitchen table in January, 2011 and said that she was upset with Petitioner because she did not allow guns in her home.  She also corroborated Grayczyk's testimony about Petitioner coming to their apartment at about 1:00 a.m. on February 10, 2011.

Jerob Mathis, the surviving victim of the shooting, testified that he knew Petitioner.  At about 8:00 p.m. on February 9, 2011, Petitioner called him to buy crack cocaine.  Mathis arranged to meet Petitioner in the parking lot of the Little Easy Bar and sell him a rock of crack cocaine for $40.  Mathis drove his minivan to the bar and parked. A few minutes later, Petitioner arrived on foot from the alley and got into the front seat of the van.  They completed their drug transaction.  Petitioner then exited the van and walked back toward the alley.  Mathis returned to Detroit.  Petitioner called him several more times that night and wanted to do another drug deal to buy $40 worth of cocaine. They agreed to meet in the parking lot of the Little Easy Bar at 2 :00 a.m.  Before going to the bar, Mathis drove to Redford and picked up Brittany Burrell, who did not know that

he was going to do a drug deal.  When they arrived at the bar, he parked and called Petitioner who arrived a few minutes later.  Petitioner slid open the back door of the van, got into the back seat behind Burrell, and slid the door closed.   Mathis told Petitioner to look at a drunk man on the street trying to get up.  Petitioner then shot him in the head. He blacked out, but heard Burrell screaming.  Mathis exited the van, stumbled, and ran across the street to the Lamplighter Motel.  He heard two more shots as he was running and heard Burrell screaming.  Following the shooting, he had surgery and was hospitalized for five days.

On cross-examination, Mathis testified that his relationship with Petitioner was drug dealer and buyer.  His contacts with Petitioner arose by phone and he normally sold Petitioner drugs at Petitioner's grandmother's apartment.  Mathis also testified that he did not have a gun on him on the night of the shooting because he never carried a weapon. Mathis said that he had no indication that Petitioner was going to shoot him and there was no dispute over their drug transactions.  Mathis admitted that he did not see Petitioner shoot him because he was looking out of the window, but reiterated that the shots came from the back seat of his van.

Wayne County Assistant Medical Examiner Francisco Diaz testified that he conducted the autopsy on Brittney Burrell on February 14, 2011.  Her cause of  death was a gunshot wound to the head.  He could not say if she was shot more than once due to her medical treatment, but he recovered one bullet from the left side of her brain.

5

Manuel Calvillo, Petitioner's friend, testified that he spent time with Petitioner at Petitioner's grandmother's home. Calvillo was with Petitioner when Petitioner shot a man on the street between 10:00 p.m. and 11:00 p.m. on February 4, 2011. Calvillo explained that he and Petitioner had been at a bar on Dix near Outer Drive. They left the bar and were walking to a liquor store when a white man walked past them. Petitioner sped up and shot the man twice with a gun. The man fell down face first. Calvillo could not determine whether a photograph of a revolver depicted the gun that Petitioner used that night. After the shooting, Petitioner and Calvillo ran to Petitioner's grandmother's home and stayed there until morning. Petitioner told Cavillo that he did not know why he shot the man. Calvillo did not initially report the shooting because he was afraid that Petitioner would retaliate against him and his family. On cross-examination, Calvillo acknowledged that he told police about the Osborne shooting only after Calvillo was arrested at his mother's home in connection with that shooting.

The parties stipulated that if Wayne County Assistant Medical Examiner Lokman Sung were called to the stand, he would testify that he performed an autopsy on the body of Dwight Osborne, the victim of the February 4, 2011 shooting, that Osborne died from a gunshot would to the back of the neck, and that the manner of death was homicide.

Lincoln Park Police Detective Patrick Culter testified that he responded to the call from Michelle Morin on February 13, 2011 and recovered a revolver from under some bushes in the snow outside of her house. Morin's house was three houses from Vago's flat on the opposite side of the street. Detective Culter was also involved in the

investigation into Dwight Osborne's homicide.  He responded to that scene with another officer between 10:00 p.m. and 11:00 p.m. on February 4, 2011.  Sharon Fiske's apartment was about one and a half blocks away from that location.  He attended Osborne's autopsy and learned that Osborne had been shot in the back of the neck.

On cross-examination, Detective Culter testified that he was also involved in the investigation of this case.  He spoke to Michael Vago at his upper flat sometime after midnight on February 10, 2011.  Vago told him that Petitioner came running in and said, "He tried to rob me so I had to shoot him."  Detective Culter acknowledged that his police report indicated that Vago reported that Petitioner had said that he shot someone because he had to defend himself.  On re-direct examination, Detective Culter testified that in Vago's written statement, Vago said that Petitioner told him that he shot someone over weed or marijuana and Vago told Petitioner that he had to leave.

Lincoln Park Police Detective Scott Lavis testified that he interviewed Patrick Grayczyk, Sharon Fiske, Kim James, and Michael Vago as part of the shooting investigation.  He talked to Grayczyk about the January, 2011 gun incident at Fiske's apartment.  Grayczyk told him that Petitioner said that he was carrying a gun because "I don't want no nigger shooting at me."  He also checked Grayczyk's cell phone, which confirmed that Grayczyk called Petitioner at 1:15 a.m. and 1:17 a.m. on February 10, 2011.  Kim James told him that Petitioner left their apartment for 45 to 60 minutes and told that them he was going out to buy some weed or crack.  Michael Vago told him that on February 9, 2011, Petitioner talked about an incident on February 4, 2011 in which

7

Petitioner and a friend tried robbing man, but the man started fighting so they shot him. Sharon Fiske told him about Petitioner bringing a gun to her apartment in late January, 2011. She told Petitioner that either the gun went or he went. Fiske told him that Petitioner was upset, took the gun, and left her apartment.

Michelle Morin testified that she lived on Olive Street in Lincoln Park and that she found a gun on the snow outside her house on February 13, 2011. She notified her husband and they called the police. She identified a photograph of the gun as the one she found that day. She also testified that Vago's residence was about 14 houses from her house and that the Little Easy Bar was two blocks from her house.

Lincoln Park Police Sergeant Joseph Lavis, supervisor of the Detective Bureau testified that he was involved in the investigation into the death of Brittney Burrell and the shooting of Jerob Mathis. He responded to the scenes at the Lamplighter Motel and the Little Easy Bar. When he arrived at the bar, there was a minivan in the parking lot, but the victims were not present. On the driver's floorboard, he found a bag of about seven grams of cocaine, which is consistent with an amount carried by a drug dealer. On the passenger's side, he found a purse with Brittney Burrell's personal items. The driver's side window appeared to have been shattered from the inside of the van because most of the broken glass was in the parking lot. There was also a gunshot hole in the driver's side of the windshield, which appeared to have been fired from inside the vehicle because the glass was pushed outward. Sgt. Lavis identified several photographs from the scene. It was his opinion that the gunshots had been fired from inside the vehicle.

8

He also spoke to Michael Vago and Kim James at their upper flat and learned that Petitioner had a revolver at the flat and discarded spent shell casings from an upstairs window. He used a metal detector and found four spent casings in a three foot radius about 25 feet from the building outside of Vago's window.

He and other officers also inspected the Little Easy Bar parking lot and the Lamplighter Motel. They did not find any spent casings inside the minivan, in the parking lot, or anywhere in the vicinity. This indicated to him that a revolver had been used in the shooting because a revolver does not eject spent casings. Sgt. Lavis testified that Sharon Fiske's apartment, the Little Easy Bar, Michael Vago's flat, and Michele Morin's home were all in close proximity to one another.

While he was on the scene at the Little Easy Bar parking lot, he saw Petitioner walking southbound on the east side of Dix. This was around 2:30 a.m. and it was very cold out. There were police cars at the scene and police detectives taking pictures of the scene. He thought this was kind of odd. A few minutes later, he saw Petitioner again, this time walking north on the west side of Dix, which was the sidewalk of the Little Easy Bar. He then made contact with Petitioner, who was taken into custody.

Sgt. Lavis also testified about Dwight Osborne's shooting. He said that if Petitioner had wanted to meet Jerob Mathis at the intersection of Dix and Monty, that was the same location where Osborne was shot. Sgt. Lavis identified a DVD which contained footage from a security camera that showed Osborne walking southbound on Dix crossing Monty, showed Osborne being followed by a second person with a third person trailing

behind, showed a flash which appeared to be gunshots coming from the person immediately following Osborne, showed Osborne falling to the ground, and showed the two men fleeing together on foot.  The DVD did not show any contact between Osborne and either of the other two people before the flash.  Sgt. Lavis then identified another DVD of security camera footage from from a Mexican restaurant at Dix and Olive.  One clip showed a person walking southbound in the alley from Olive toward the Little Easy Bar.  Sgt. Lavis believed that the person in the video was Petitioner.

On cross-examination, Sgt. Lavis testified that as the officer in charge, he received three spent bullets – one recovered from Jerob Mathis during surgery, one recovered from Brittney Burrell's brain, and one from Dwight Osborne's body.  All three were submitted to the Michigan State Police Crime Lab, but had not yet been analyzed.  The revolver found outside Marin's house and the spent casings found outside of Vago's flat were also submitted, but had not yet been analyzed due to backlog.  Sgt. Lavis also clarified that the first clip from the Mexican restaurant footage showed a person walking southbound west of southbound Dix from Olive Street just prior to the shooting at the Little Easy Bar.  The second clip showed the same person running the opposite way back toward Olive Street. The clip showed the person stop and look toward the Lamplighter Motel.  The person seemed to peer around a corner then continue to walk toward Olive Street in the direction of Vago's flat.  Lastly, Sgt. Lavis testified due to the powder burns and the gunpowder residue on the minivan's front passenger seat headrest, it was impossible for the shot that hit Brittney Burrell to have been fired from outside and into the minivan.

10

Petitioner did not testify at trial, but he did present defense witnesses.  Lincoln Park Police Officer Jeffrey Stacho testified that at about 1:00 a.m. on February 10, 2011, he and other officers responded to a call to the Lamplighter Motel.  He encountered Jerob Mathis in the motel parking lot.  Mathis was on his cell phone and was holding the back of his head, saying that he had been shot in the head.  He and the two other officers tried to get more information from Mathis about the shooting, but Mathis just kept saying that he had been shot in the head.  Mathis did not give them a physical description of the suspect, say that he knew the suspect, or say that the suspect had been in his vehicle at that time.  Officer Stacho acknowledged reporting that Mathis was uncooperative.

Lincoln Park Police Sergeant Joseph Lavis (recalled by the defense) testified that when Petitioner was arrested, his clothes were taken into evidence and transported to the Michigan State Police Crime Lab.  On cross-examination, Sgt. Lavis testified that he interviewed Jerob Mathis at Oakwood Hospital between 3:00 a.m. and 4:00 a.m. on February 10, 2011.  At that time, Mathis told him that the shooter was a white male, 18 or 19 years of age, who he knew as Joe-Joe, and that he had a cross tattooed under one of his eyes (as does Petitioner).

At the close of trial, the jury convicted Petitioner of first-degree premeditated murder, assault with intent to commit murder, and felon in possession of a firearm.  The trial court subsequently sentenced him to life imprisonment without parole, a concurrent term of 30 to 50 years imprisonment, and a consecutive term of two years imprisonment on those convictions.

11

Following sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising the same claims presented in his habeas petition. The court ruled that the claims lacked merit and affirmed his convictions. *People v. Bigelow*, No. 305758, 2013 WL 1352440 (Mich. Ct. App. April 4, 2013) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied. *People v. Bigelow*, 495 Mich. 906, 839 N.W.2d 680 (2013).

Petitioner thereafter filed his federal habeas petition raising claims concerning the conduct of the prosecutor, his appearance in prison clothing at trial, and the admission of other acts evidence. Respondent has filed an answer to the petition contending that it should be denied. Petitioner has filed a reply to that answer.

## III.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, sets forth the standard of review that federal courts must use when considering habeas petitions brought by prisoners challenging their state court convictions. The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

12

State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

13

A state court's determination that a claim lacks merit "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).  Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  *Id.*  Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting

14

*Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer*, 538 U.S. at 71-72. Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require <u>awareness</u> of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

While the requirements of "clearly established law" are to be determined solely by United States Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV.   Discussion

### A.     Prosecutorial Misconduct Claim

Petitioner first asserts that he is entitled to habeas relief because the prosecutor engaged in misconduct by shifting the burden of proof during closing arguments.

Respondent contends that this claim lacks merit.

The United States Supreme Court has made clear that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, however, a habeas petitioner must demonstrate that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly*); *Parker v. Matthews*, _ U.S. _, 132 S. Ct. 2148, 2153 (2012) (confirming that *Donnelly/Darden* is the proper standard).

The Michigan Court of Appeals considered this claim on direct appeal and denied relief. The court explained:

> Defendant argues that the prosecutor denied him a fair trial by impermissibly shifting the burden of proof during closing argument. This Court reviews preserved claims of prosecutorial misconduct de novo to determine if the defendant was denied a fair and impartial trial. *People v. Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). We decide prosecutorial misconduct claims on a case-by-case basis, examining the record and the prosecutor's remarks in context. Id.
>
> In his closing argument, the prosecutor said, "They can't give you any alternative explanation for his whereabouts. There's nobody who can come into this Court and say, 'I was with Joseph Bigelow[.]'" Defendant maintains that this statement suggested to the jury that defendant had to produce evidence to account for his whereabouts when the crime occurred. We disagree.
>
> "[A] prosecutor is free to argue the evidence and all reasonable inferences arising from it as they relate to the prosecutor's theory of the case." *People v. Goodin*, 257 Mich App 425, 433; 668 NW2d 392 (2003). "A prosecutor may not imply in closing argument that the defendant must present a

16

reasonable explanation for damaging evidence or comment on the defendant's failure to present evidence because such an argument tends to shift the burden of proof ." *People v. Fyda*, 288 Mich App 446, 463–464; 793 NW2d 712 (2010). However, it is not improper for a prosecutor to argue that inculpatory evidence is undisputed, even if the defendant is the only person who could have contradicted the evidence. *Id*. at 464.

Read in context, the prosecutor's comments related to the fact that the evidence presented regarding defendant's whereabouts during the time of the crime was undisputed. The words, "can't" and "there's nobody who can" in the prosecutor's argument communicate the idea that the evidence could only show one thing, that defendant was at or near the crime scene during the time of the crime, and that it is impossible to present any evidence to the contrary. In our view, the statement at issue was no more than a summation of the evidence adduced at trial that showed defendant was at the crime scene and no evidence could show differently. This is a permissible argument regarding the undisputed nature of the inculpatory evidence. *See Fyda*, 288 Mich App at 464–465 ("The prosecutor's statements were proper commentary on the weaknesses of [the defendant's] theory of defense and did not constitute prosecutorial misconduct."); *Goodin*, 257 Mich App at 433 ("[A] prosecutor is free to argue the evidence and all reasonable inferences arising from it as they relate to the prosecutor's theory of the case."). Moreover, following defense counsel's objection, the prosecutor explicitly told the jury that the defendant did not have the burden of proof. The preceding statements regarding the evidence of defendant's whereabouts that night and the prosecutor's subsequent statement that defendant, in fact, did not have to prove anything, demonstrate that the statement did not improperly shift the burden of proof.

Moreover, were we to find that the prosecutor erred in making the disputed remarks, the trial court cured any alleged error in its instructions to the jury that the prosecution has the burden to prove all the elements of the offense beyond a reasonable doubt and that defendant had an absolute right not to testify. Because we presume jurors follow their instructions, *People v. Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), there is no basis to conclude that the jury believed that defendant had the burden of offering evidence of his whereabouts on the night of the crime.

*Bigelow*, 2013 WL 1352440 at *1-2.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  It is well-settled that a prosecutor may not shift the burden of proof to the defendant, *Patterson v. New York*, 432 U.S. 197, 215 (1977), or imply that the defendant is required to provide evidence to prove his or her innocence.  *Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006).  In this case, however, the prosecutor did not improperly shift the burden of proof by arguing to the jury that the evidence was uncontradicted because a prosecutor may argue that inculpatory evidence is undisputed.  "[P]rosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence."  *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005).  Prosecutors can also point out the lack of evidence supporting the defense theory.  *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005).  Such was the case here.  The prosecutor argued from the evidence, and lack of conflicting evidence, that Petitioner was in the area where the crime occurred and that he committed the shooting.  The prosecutor did not shift the burden of proof to the defense.  To be sure, the prosecutor acknowledged that it was the State's burden to prove the elements of the charged crimes beyond a reasonable doubt.

Moreover, even if the prosecutor erred, Petitioner was not denied a fair trial.  The trial court properly instructed the jury about the elements of the offenses, the presumption of innocence, and the burden of proof.  The court also explained that the attorneys' arguments are not evidence and told the jury that if an attorney said something

18

contrary to the court's instructions the jury must follow the instructions. Jurors are presumed to follow the court's instructions. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors ... take an oath to follow the law as charged, and they are expected to follow it."). Petitioner fails to show that the prosecutor's arguments were improper and/or that they rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### B.    Prison Clothing Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court required him to wear prison clothing at trial in violation of his due process rights. Respondent contends that this claim lacks merit.

Due process precludes a defendant from being compelled to stand trial in jail or prison garb as long as the defendant makes a timely objection/request. *Estelle v. Williams*, 425 U.S. 501, 512 (1976). Compelling a defendant to appear in prison garb impairs the presumption of innocence guaranteed under the Fourteenth Amendment because it presents the unacceptable risk of affecting a juror's judgment and furthers no essential state policy. *Id*. at 503-05. It is only a state's compulsion that is prohibited and not the wearing of prison garb in general because defendants sometimes use prison garb as a tactic to elicit sympathy from the jury. *Id*. at 508.

The Michigan Court of Appeals denied relief on this claim. The court explained:

Defendant contends that the trial court violated his due process rights by compelling him to wear prison attire in front of the jury. In situations like this, in which the trial court observed defendant and concluded his clothing did not resemble "prison garb," we review a trial court's decision for an abuse of discretion. *People v. Harris*, 201 Mich App 147, 151; 505 NW2d 889 (1993).

At the start of trial, defendant requested an adjournment to obtain civilian clothes or a brief recess to change into civilian clothes brought into court by a family member. The trial court denied defendant's request for an adjournment because the trial date had been set three months earlier, during which time defendant had ample opportunity to obtain civilian clothes. For safety and security reasons, the trial court also denied defendant's request to change into clothes at the courthouse. We hold that the trial court did not abuse its discretion in either regard.

Generally, if a defendant makes a timely request to be allowed to wear civilian clothes, his request must be granted. *Harris*, 201 Mich App at 151. However, a defendant is not deprived of due process by wearing jail garb that appears to be civilian clothing. *Id*. at 151–152. Denial of due process occurs only if a defendant's clothing impairs the presumption of innocence. *People v. Lewis*, 160 Mich App 20, 30–31; 408 NW2d 94 (1987).

Here, the trial court looked at defendant's clothing and found that it did not resemble prison attire:

> There's no prejudicial markings on the clothing. The—any jail markings have been turned inside out.
>
> We've done this numerous times, Mr. Comorski [defense counsel], and there has been numerous Court of Appeals cases indicating that as long as we take those steps to remedy the situation, that that is not unduly prejudicial to the defendant as long as—in fact, we've actually even had them in their green shirts with the—the identifiable markings turned inside out, which is not quite what we have here. We have him wearing a white T-shirt and his green pants inside out so the markings are not displayed to the jury. So we're good to go.

20

> We "defer to the trial court's opportunity to observe defendant and its finding that the clothes did not prejudicially mark defendant as a prisoner." *Harris*, 201 Mich App at 152. We find no abuse of discretion in denying defendant's request.

*Bigelow*, 2013 WL 1352440 at *2.

The state court's denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. First, Petitioner's request to obtain clothes at the start of trial and/or to change into clothes at the courthouse was not particularly timely. Second, and more importantly, Petitioner's clothing was not clearly-identifiable as prison garb and courts are not required to furnish alternative clothing or allow a defendant to wear particular clothing. *See, e.g., United States v. Williams*, 641 F.3d 758, 767 (6th Cir. 2011); *accord Van Gorder v. Allerd*, 387 F. Supp. 2d 251, 261 (W.D.N.Y. 2005) (citation omitted) ("[A]lthough a defendant may not be compelled to stand trial in identifiable prison garb, a defendant has no right under state or federal law to be provided with any particular type of civilian clothing."); *Adams v. Smith*, 280 F. Supp. 2d 704, 718 (E.D. Mich. 2003) (Tarnow, J.). Because Petitioner was not compelled to stand before the jury in clearly-identifiable prison clothing, he cannot show that he was denied a fair trial.

Furthermore, even assuming that the trial court erred in denying the clothing request, any such error was harmless. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict."

*Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993): *see also Fry v. Pliler*, 551 U.S. 112, 117–18 (2007) (confirming that the *Brecht* standard applies in "virtually all" habeas cases); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411 (6th Cir. 2009) (ruling that *Brecht* is "always the test" in the Sixth Circuit). Harmless error analysis has been applied to claims involving the use of prison clothing and shackles. *See, e.g., Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005) (citing Supreme Court cases). Petitioner's wearing of prison clothes, which were unmarked as such, did not prejudice him or have a substantial effect or influence on the jury's verdict.  This is particularly so given the significant evidence of guilt presented at trial, including the surviving victim's testimony and Petitioner's own admissions about firing a weapon that night.  Habeas relief is not warranted on this claim.

### C.    Evidentiary Claim

Lastly, Petitioner asserts that he is entitled to habeas relief because the trial court erred in admitting other acts evidence - evidence of another shooting committed by Petitioner near the time of this incident.  Respondent contends that this claim is not cognizable and/or lacks merit.

A federal court may only grant habeas relief to a person who is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine

state-court determinations on state-law questions"); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). "Trial court errors in state procedure or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at 69-70); *see also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

The Michigan Court of Appeals denied relief on these claims. The court explained:

> Defendant asserts that the trial court erred in granting the prosecution's motion to admit other acts evidence under MRE 404(b). The admissibility of bad acts evidence is within the trial court's discretion and will be reversed on appeal only when there has been a clear abuse of discretion. *People v. Crawford*, 458 Mich 376, 383; 582 NW2d 785 (1998). A court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes. *People v. Orr*, 275 Mich App 587, 588–589; 739 NW2d 385 (2007). "The determination whether the probative value of evidence is substantially outweighed by its prejudicial effect is best left to a contemporaneous assessment of the presentation, credibility and effect of the testimony." *People v.. Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009). Preliminary questions of law are subject to de novo review. *People v. Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010).
>
> The evidence at issue involved a separate fatal shooting of Dwight Osborne that occurred six days prior to the charged offenses and allegedly involved defendant. Specifically, the evidence introduced at trial included testimony from defendant's companion who was with him when he shot Osborne without provocation or warning, security camera footage capturing the shooting, and testimony from police officers who

23

investigated the shooting. In its pre-trial motion, the prosecution offered three purposes for the evidence: identity, intent, and motive. In the event defendant argued he was not the perpetrator, the other acts evidence tended to establish his identity in light of the similarities between the two crimes. Alternatively, if defendant's theory of the case was self-defense, the evidence tended to show that defendant formed the requisite intent for first-degree murder. The prosecution also argued that the evidence tended to establish defendant's motive in committing the crime because both murders were "thrill killings." The trial court granted the prosecution's motion and ruled that, depending on how the trial played out, the evidence was admissible to show either identity or intent.

Defendant argues that the two shootings were not sufficiently similar to show defendant's intent or identity regarding the charged offenses, and the evidence was unnecessary to establish identity because an eyewitness was slated to identify defendant as the perpetrator. We hold that the evidence was admissible under MRE 404(b) to establish intent. MRE 404(b)(1) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Evidence sought to be admitted under MRE 404(b) must meet four requirements:

First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury. [*People v. VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).]

MRE 404(b) plainly provides that "intent" is a proper purpose for which to admit other acts evidence. At issue here are the second and third elements of *VanderVliet*. Regarding the second element of MRE 404(b), relevance, this Court assesses relevancy by determining whether the evidence, under a

24

proper theory, has any tendency to make the existence of a fact of consequence in the case more or less probable than it would be without the evidence. *See* MRE 401, 402; *People v. Sabin*, 463 Mich 43, 57; 614 NW2d 888 (2000). The relevance element includes two inquiries: materiality and probativeness. *Sabin*, 463 Mich at 57 ("Relevant evidence is evidence that is material [related to any fact that is of consequence to the action] and has probative force [any tendency to make the existence of a fact of consequence more or less probable than it would be without the evidence].") "Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case." *Crawford*, 458 Mich at 389, citing McCormick, Evidence (4th ed), § 185, p 773. The probative force inquiry requires the evidence have "any tendency to make the existence of any [consequential] fact ... more probable or less probable than it would be without the evidence." MRE 401. This is a low threshold. *Crawford*, 458 Mich at 390.

As part of its burden of proof regarding the first-degree murder and assault with intent to commit murder charges, the prosecution had to prove beyond a reasonable doubt that defendant intended to cause the deaths of Jerob Mathis and Brittany Burrell. *See* MCL 750.316(a) (defining first-degree murder as "Murder perpetrated by means of ... willful, deliberate, and premeditated killing."); MCL 750.83 (defining assault with intent to commit murder as "Any person who shall assault another with intent to commit the crime of murder [.]"); *see also Crawford*, 458 Mich at 389 (stating that the elements of the offense are always "in issue" and, thus, material).

The trial court did not explain in its ruling the relevance between the separate shooting and defendant's intent in this case. However, absent the other acts evidence, a reasonable jury faced with Mathis's testimony could conceivably disbelieve the explanation that defendant, without warning or provocation, shot Mathis and Burrell for no apparent reason. Other acts evidence that showed defendant committed another unprovoked killing for no apparent reason was relevant to show whether defendant formed the requisite intent in this case. Intent, always an issue in murder trials, became even more important when the jury was presented with testimony that defendant stated after the shooting that he shot someone in self-defense. However, the other acts evidence, which involved a similar unprovoked shooting in the back of the victim's head, included evidence that defendant admitted to shooting someone intentionally, *i.e.*, not in self-defense. Faced with arguably implausible testimony that defendant simply shot Mathis and

Burrell for no reason, in addition to evidence that defendant may have acted in self-defense (and therefore did not form the requisite intent), the other acts evidence tending to show defendant formed the requisite intent under similar circumstances was logically relevant to whether defendant formed the requisite intent for the charged offenses.

Defendant argues that the evidence was unduly prejudicial because limiting instructions are insufficient when there is no valid purpose for the evidence. However, as discussed, there was a valid purpose for the evidence. Defendant further argues that, even assuming a valid purpose, the limiting instructions themselves were nonetheless insufficient. Here, the court instructed the jury as follows:

> You may only think about whether this evidence tends to show that the—the—that the defendant specifically meant to kill and for an alternative purpose of who committed the crime that the—or crimes that the defendant is now charged with. You must not consider the evidence for any other purpose. For example, you must not decide that it shows the defendant is a bad person or that he's likely to commit crimes.

> You must not convict the defendant here because you think he is guilty of other bad acts or bad conduct.

"A carefully constructed limiting instruction rendered by the trial court would be sufficient to counterbalance any potential for prejudice spawned by the other acts evidence." *People v. Martzke*, 251 Mich App 282, 295; 651 NW2d 490 (2002). Because we presume jurors follow their instructions, there is no reason to believe that the jury was prejudiced by the evidence or considered it for improper purposes. *Graves*, 458 Mich at 486.

Because the evidence was both logically relevant to establishing defendant's intent regarding the charged offense and not unduly prejudicial in light of the limiting instructions, we hold that the trial court did not abuse its discretion in admitting the other acts evidence under MRE 404(b).

*Bigelow*, 2013 WL 1352440 at *3-5.

26

The state court's denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  First, to the extent that Petitioner asserts that the trial court erred in admitting evidence under Michigan law, he merely alleges violations of state law which do not justify federal habeas relief.  *See, e.g., Bey*, 500 F.3d at 519.  State courts are the final arbiters of state law and the federal courts will not intervene in such matters.  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002).  Habeas relief does not lie for perceived errors of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Second, Petitioner fails to establish that the admission of the other acts evidence resulted in a federal due process violation.  As to the admission of other acts evidence, the United States Supreme Court has declined to hold that similar "other acts" evidence is so extremely unfair that its admission violates fundamental conceptions of justice.  *Dowling v. United States*, 493 U.S. 342, 352–53 (1990).  Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh*, 329 F.3d at 512.  Consequently, there is no Supreme Court precedent that the state court decisions could be deemed "contrary to" under 28 U.S.C. § 2254(d)(1).  *Id*. at 513; *Adams v. Smith*, 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003).  Petitioner thus fails to state a claim upon which habeas relief may be granted as to such matters.

Moreover, even if Petitioner states a cognizable claim as to the other acts evidence, he is not entitled to relief.  He has not shown that the admission of the other acts evidence rendered his trial fundamentally unfair.  The other acts evidence was relevant and admissible on the issue of identity and intent under Michigan Rule of Evidence 404(b).  The prosecution argued as much at trial and did not make an improper propensity argument.  Furthermore, the risk of unfair prejudice was mitigated by the fact that the trial court instructed the jury on the proper consideration of the evidence.  As noted, jurors are presumed to follow a court's instructions.  *Penry*, 532 U.S. at 799 (citing *Richardson*, 481 U.S. at 211; *Powell*, 469 U.S. at 66).  Petitioner fails to show that the admission of the other acts evidence was erroneous or, more importantly for purposes of habeas review, that it rendered his trial fundamentally unfair.  Habeas relief is not warranted on this claim.

## V.    Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on his claims.  Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue.  *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that

28

reasonable jurists would find the court's assessment of the constitutional claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller v. Cockrell*, 537 U.S. 322, 327 (2003). Having considered the matter, the Court concludes that Petitioner fails to make a substantial showing of the denial of a constitutional right as to his claims. Accordingly, the Court **DENIES** a certificate of appealability. The Court also **DENIES** leave to proceed in forma pauperis on appeal as an appeal cannot be take in good faith. Fed. R. App. P. 24(a). This case is closed.

      **IT IS SO ORDERED**.

                                      s/Paul D. Borman
                                      PAUL D. BORMAN
                                      UNITED STATES DISTRICT JUDGE

Dated:  April 26, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 26, 2016.

                                        s/Deborah Tofil
                                      Case Manager

29